RECORD NO. 15-1011

In The

# United States Court of Appeals

## For The Fourth Circuit

## VINCENT T. MERCER,

*Plaintiff – Appellant*,

**v.**

## PHH CORPORATION,

*Defendant – Appellee*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE**

———————

## BRIEF OF APPELLANT

———————

Daniel L. Cox
MARR & COX, LLP
Inner Harbor Center
400 East Pratt Street, 8th Floor
Baltimore, Maryland  21202
(410) 254-7000

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1011__          Caption: __Vincent T. Mercer v. PHH Corporation__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Vincent T. Mercer__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                          ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Daniel L. Cox                          Date:  January 19, 2015

Counsel for:  Vincent T. Mercer

## CERTIFICATE OF SERVICE
**************************

I certify that on  January 19, 2015  the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Daniel L. Cox                                      January 19, 2015
        (signature)                                            (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..........................................iii

I.   JURISDICTIONAL STATEMENT...................................1

II.  STATEMENT OF THE ISSUES...................................1

III. STATEMENT OF THE CASE.....................................2

     Procedural History.......................................6

     Statement of the Facts...................................8

IV.  SUMMARY OF ARGUMENT......................................17

     Race Discrimination.....................................17

     Retaliation.............................................20

V.   ARGUMENT................................................22

     1.   The Standard of Review.............................22

     2.   Plaintiff Mercer Exhausted his Administrative
          Remedies for his Substantive Race Discrimination
          Claim Under the Anti-Tripwire Doctrine.............25

          A.   PHH CEO'S STATEMENTS "SLAVE SHIP AND WHIPS"
               AND "MONKEYS" COMPLAINED OF AS "RACIALLY
               MOTIVATED AND DISCRIMINATORY" AND BEING
               "DISCRIMINATED AGAINST AND SUBJECT TO
               RETALIATION" WERE REASONABLY RELATED
               CHARGES, PLACING DEFENDANT ON FULL NOTICE OF
               A RACE DISCRIMINATION CLAIM...................26

     3.   Plaintiff's Retaliation Claim Should Also Proceed
          to a Jury for a Finding of Fact and Verdict
          Because Material Facts Are In Dispute Under Both
          the Pretextual and the Close Temporal Proximity
          Doctrines..........................................33

A.  THERE IS A GENUINE MATERIAL DISPUTE WHETHER
    DEFENDANT INVESTIGATED PLAINTIFF WITHIN
    FORTY-FIVE DAYS OF PLAINTIFF'S INTERNAL
    RACIAL COMPLAINT, AND THEN FIRED HIM...........38

B.  THERE IS A GENUINE MATERIAL DISPUTE WHETHER
    DEFENDANT'S HR EXECUTIVE ENNIS, WHO WAS
    INVOLVED IN BOTH INCIDENTS, TOLD PLAINTIFF
    "IF IT'S A FIGHT YOU WANT, A FIGHT YOU WILL
    GET," INVESTIGATING PLAINTIFF ONLY WEEKS
    LATER AND THEN FIRING HIM......................40

C.  THERE IS A GENUINE MATERIAL DISPUTE WHETHER
    THE REASON FOR FIRING PLAINTIFF IS FALSE
    BECAUSE IT WAS KNOWN AND PERMITTED BY PHH
    CHAIN OF AUTHORITY............................41

D.  THERE IS A GENUINE MATERIAL DISPUTE WHETHER
    BUT-FOR PLAINTIFF'S COMPLAINT ABOUT
    SELITTO'S STATEMENTS AND REQUIREMENT FOR A
    COMPANY-WIDE APOLOGY, PLAINTIFF WOULD NOT
    HAVE BEEN TERMINATED..........................43

VI.  CONCLUSION..............................................49

VII. REQUEST FOR ORAL ARGUMENT...............................49

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...............................22, 24, 25

*Balas v. Huntington Ingalls Indus.*,
    711 F.3d 401 (4th Cir. 2013).....................26, 27, 30

*Banhi v. Papa John's USA, Inc.*,
    2013 U.S. Dist. LEXIS 100291 (D. Md. July 17, 2013)...18, 30

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007).......................................23

*Bouchat v. Balt. Ravens Football Club, Inc.*,
    346 F.3d 514 (4th Cir. 2003)..............................25

*Bowe v. Colgate-Palmolive Co.*,
    416 F.2d 711 (7th Cir. 1969)..............................27

*Bryant v. Bell Atl. Md., Inc.*,
    288 F.3d 124 (4th Cir. 2002).........................27, 28

*Burlington Northern and Santa Fe Ry. v. White*,
    548 U.S. 53, 126 S. Ct. 2405,
    165 L. Ed. 2d 345 (2006).............................35, 36

*Burns v. AAF-McQuay, Inc.*,
    96 F.3d 728 (4th Cir. 1996)...............................31

*Byington v. NBRS Fin. Bank*,
    903 F. Supp. 2d 342 (D. Md. 2012)........................30

*Causey v. Balog*,
    162 F.3d 795 (4th Cir. 1998)........................*passim*

*Chacko v. Patuxent Inst.*,
    429 F.3d 505 (4th Cir. 2005)..............................32

*Cohens v. Md. Dept. of Human Res.*,
    933 F. Supp. 2d 735 (D. Md. 2013)........................32

*Conley v. Gibson*,
    355 U.S. 41 (1957)........................................23

*Darvishian v. Green*,
    404 F. App'x 822 (4th Cir. 2010).........................41

*DeJarnette v. Corning, Inc.*,
    133 F.3d 293 (4th Cir. 1998).............................41

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
    290 F.3d 639 (4th Cir. 2002).............................25

*Dickey v. Greene*,
    710 F.2d 1003 (4th Cir. 1983), *rev'd on other grounds*,
    729 F.2d 957 (4th Cir. 1984).............................27

*Dowe v. Total Action Against Poverty*,
    145 F.3d 653 (4th Cir. 1998).............................34

*EEOC v. Navy Fed. Credit Union*,
    424 F.3d 397 (4th Cir. 2005)...................20, 24, 33

*Erickson v. Pardus*,
    551 U.S. 89 (2007).......................................23

*Evans v. Techs. Applications & Serv. Co.*,
    80 F.3d 954 (4th Cir. 1996)..............................26

*Holder v. City of Raleigh*,
    867 F.2d 823 (4th Cir. 1989).............................43

*Hooper v. North Carolina*,
    2006 U.S. Dist. LEXIS 72268 (M.D.N.C. Oct. 3, 2006),
    *aff'd, Hooper v. North Carolina*, 222 Fed. Appx. 271,
    2007 U.S. App. LEXIS 7105 (4th Cir. Mar. 27, 2007).......35

*Jiminez v. Mary Wash. Coll.*,
    57 F.3d 369 (4th Cir. 1995)..........................39, 44

*Jones v. Calvert Group, Ltd.*,
    551 F.3d 297 (4th Cir. 2009).........................27, 28

*Leatherman v. Tarrant County narcotics Intelligence &
Coordination Unit*,
    507 U.S. 163 (1993)......................................22

*Mallik v. Sebellius,*
    964 F. Supp. 2d 531 (D. Md. 2013)......................17, 26

*Merritt v. Old Dominion Freight Line, Inc.,*
    601 F.3d 289 (4th Cir. 2010)...............................32

*Seabulk Offshore, Ltd. v. Am. Home Assurance Co.,*
    377 F.3d 408 (4th Cir. 2004)...............................24

*Sewell v. Strayer Univ.,*
    956 F. Supp. 2d 658 (D. Md. 2013).........................31

*Sydnor v. Fairfax County, VA,*
    681 F.3d 591 (4th Cir. 2012)..................17, 18, 26, 30

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
    133 S. Ct. 2517 (2013).......................43, 45, 46, 47

*White v. Mortage Dynamics*, *Inc.,*
    528 F. Supp. 2d 576 (D. Md. 2007).........................24

**STATUTES**

28 U.S.C. § 1291................................................1

28 U.S.C. § 1331................................................1

42 U.S.C. § 2000e-2.........................................1, 17

42 U.S.C. § 2000e-3.........................................1, 20

**RULES**

Fed. R. Civ. P. 8(a)(2)........................................23

Fed. R. Civ. P. 12(b)(6)...................................22, 24

Fed. R. Civ. P. 56(a)..........................................24

Fed. R. Civ. P. 56(c)..........................................24

**REGULATIONS**

Md. Code Regs. 14.03.01.03(D)(2)-(4)........................19, 26

Md. Code Regs. 14.03.01.03(D)(6)........................19, 29, 32

Md. Code Regs. 14.03.01.03(D)(7)........................19, 29, 32

**OTHER AUTHORITY**

Restat. 2d of Torts, § 435A (comment a)...................45, 46

## I.  JURISDICTIONAL STATEMENT

The United States District Court for the District of Maryland ("District Court") has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.  The claims arose under the laws of the United States, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-3 of Title VII of the Civil Rights Act of 1964 ("Title VII").

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 from a Memorandum Opinion (District Court Docket 29) and final Order dated December 3, 2014 (District Court Docket 30) granting Appellee's Motion for Summary Judgment.

On January 2, 2015, Appellant timely filed a notice of appeal with the Clerk of the District Court.

## II.  STATEMENT OF THE ISSUES

Whether the District Court erred by: 1) granting dismissal of Plaintiff's race discrimination complaint for lack of subject matter jurisdiction upon overlooking the complaint contents; and, 2) granting summary judgment while material facts are in dispute that the firing was linked to HR's threats over the race complaint, reasonably proving discriminatory retaliation that would not have occurred "but-for" Plaintiff's complaint, since Plaintiff was doing his job as instructed?

1

**III. STATEMENT OF THE CASE**

On the wall at the Maryland Commission on Civil Rights where Mr. Mercer filed his racial discrimination and retaliation complaint are displayed several solemn posters of photographs from the 1960s Civil Rights marches, including young teenage African-American girls and boys being hit in the kidneys in full-force with fire hoses,  attacked like animals by dogs, and beaten with instruments.

Vincent T. Mercer was the Company-appointed chair of the PHH Diversity Committee and a manager at PHH-Arval. He complained on behalf of others and himself to a new CEO Jerry Selitto of PHH about Selitto's public statements made to a large minority employee-wide "town-hall meeting" and management at its Sparks, MD division, PHH-Arval.  Those statements outrageously[1] referenced **"slave ship and whips"** and **"monkeys climbing a ladder for the banana"** getting blown off the ladder **"by fire hoses"**. (JA 311,372-3, 486 at ¶ 16-22, 487).

Such statements to a large minority employee audience invoked extreme images of segregation and persecution and resulted in many complaints.

---

[1] Mr. Selitto testified "I went home and told my wife 'I have to meet with the Diversity Committee', my wife's a lawyer and said 'I can't believe you made that statement.' I said, 'I know, it was stupid...'". (JA 344).

2

Mr. Mercer pressed the HR Vice President Rita Ennis, and Mr. Selitto, to issue a written apology to employees, and Ms. Ennis threatened and told Mr. Mercer **"If it's a fight you want, a fight you will get."** Mr. Mercer, considering it a warning not to press for an apology for the complaining employees, still believed it was his duty as Chair of the Diversity Committee to speak up. (JA 427-8). After several weeks of pressing by Mr. Mercer, PHH finally publicly distributed an apology, on May 13, 2010, to its Sparks, MD employees via the CEO e-mail. Then, in June 2010, **30-45 days** later, PHH retaliated by launching an internal investigation against Mr. Mercer, resulting in his firing soon thereafter without warning or probationary consideration, even though the evidence showed he was innocent and the Company's own policy indicated disciplinary probation was the first step for employee redirection.[2]

Mr. Mercer pleaded his race and retaliation claims for discriminatory termination for over a year before the EEOC. There was never a doubt that his complaint included retaliation

---

[2] (JA 265, Aff. of Daniel Hahn). Mr. Hahn's affidavit contains conflicting and disputed information in that he claims he was merely performing a task required of his job of "reviewing the Agent Release Report for BTR in the June 2010 timeframe". Yet, the investigation notes state that Kim Bolin "asked" Daniel "Danny" Hahn to "conduct quality phone monitoring for the BTR department **beginning late June.**" (JA 589, See "FRI 7/23".) However, Defendant claims in averments that "while monitoring BTR calls in **early to mid-July 2010,** Quality Analyst Danny Hahn conducted "quality phone monitoring".

and race discrimination resulting in termination, as both were stated in the charged facts and then responded to, and the box-checking failure by the intake officer at the Maryland Commission on Civil Rights is insufficient as a matter of law to deny Mr. Mercer justice.

Mr. Mercer well-pleaded significant material facts in dispute. Rita Ennis, who reported to Selitto via PHH-Arval CEO George Kilroy, the man who hired Selitto as a member of PHH Corporate's Board, threatened him for making the race apology demand saying "if it's a fight you want, a fight you will get." (JA 427). This demonstrates that if he had not made the internal race complaint, no investigation and firing would have happened to him. Mr. Mercer was not the individual sending instructions to the "BTR" call team on how to manage heavy call volumes; also, PHH had authorized the "Skill 427 – phone extension 16310 – New Skill Set" by issuing the password, mailbox que number and skill sets – all of which required a supervisor's signature to receive. PHH stated in its "investigation" notes that Skill 427 needed more process development and "training", yet instead of doing so they fired Mr. Mercer but not others who were involved, such as Tim Mackin and Michele Roberts.

The new CEO Mr. Selitto, admittedly angry at his deposition about being "accused of racism" by an employee (Ms. Rhodes)(JA

312, 316-7), claimed however that he was not angry at Mr. Mercer or the Diversity Committee for their racial complaints. (JA 317-20). But this statement was belied by his testimony that he may in fact have had a conversation with Plaintiff's boss George Kilroy about the complaint <u>immediately upon his return from being confronted by Vince Mercer</u>, saying he was "surprised" by the accusations. (JA 343-5).

But-for the "surprise" he caused PHH and the new CEO Jerome Selitto over the discrimination complaints, and but-for the Company's threats of giving him the "fight you will get" if he pressed his demand for a PHH-Arval-wide apology, his 10-year service with the Company was so good that he would not have been fired.

Mr. Mercer had model, positive employee performance reviews and PHH was even profiting off of his photograph and pro-PHH statements on its website. (JA 379-407, 430-1). As confirmed by at least four (4) sworn witnesses, his call-center work was approved by his supervisors – one of whom, Kim Bolin, "investigated" and fired him, violating the PHH Code of Ethics conflicts of interest policy in doing so. (JA 411).

Freedom and the rule of law is only protected for all of us, if it is preserved for each of us individually. The illegal firing of an African-American man soon after he did his duty to his country and corporation by reporting, in good faith, racial

discrimination complaints against the company's new CEO, would
be even more destructive to the rule of law if the court were to
prevent the case from going to trial before an American jury.

Mr. Mercer has stated a *prima facie* race discrimination
case, and material questions of fact exist concerning whether
PHH retaliated against its Chair of the Diversity Committee, Mr.
Mercer, when it investigated and fired him.

Mr. Mercer is entitled to have a jury weigh the truthfulness
of witnesses and hear his claims of race discrimination and
retaliation.  There is clear and substantial injury against
Plaintiff within a short period of time after his performing the
protected activity.

**Procedural History**

On March 2, 2011, Mr. Mercer filed a charge of
discrimination with the Maryland Commission on Human Relations.
(JA 295).  Mr. Mercer was not represented by counsel in the
filing. *Id.*  He described in the charging document having a
discussion with Mr. Selitto about his "perceived racially
motivated and discriminatory comments" at the town meeting on
March 11, 2010, and that he believed he was thereafter
"discriminated against and subject to retaliation for engaging
in a protected activity...".  (JA 295).  Pursuant to regulation,
the Maryland Commission on Civil Rights filled out the typed
form and checked the boxes on the form, and Mr. Mercer was then

asked by the Commission to sign the form once they had prepared it after their interview of him.  The Maryland Commission on Civil Rights then cross-filed the complaint with the United States Equal Employment Opportunity Commission (EEOC) as charge number "846-2011-32536". (JA 295).  From what Plaintiff can determine from the record and procedural history of the investigation, no sworn statements were taken, nor were any subpoenas issued to any witness, testimonial or *duces tecum*, either by the Commission or the EEOC during any investigation of Mr. Mercer's complaint.

More than a year and a half later, on October 4, 2012, the EEOC issued Mr. Mercer a right to sue letter and on January 4, 2013 Mr. Mercer sued PHH Corporation for racial discrimination and retaliation for employment termination.

On March 19, 2014, PHH Corporation moved for summary judgment and on April 21, 2014 Mr. Mercer filed his opposition to the motion.  On May 8, 2014, PHH Corporation replied.

On December 3, 2014, the United States District Court for the District of Maryland dismissed Mr. Mercer's discrimination claim for "lack of subject matter jurisdiction" and granted PHH Corporation's summary judgment motion on Mr. Mercer's retaliation claim.

On January 2, 2015, Mr. Mercer appealed to this Court.

## **Statement of the Facts**

On March 11, 2010 the newly chosen CEO of PHH Corporation, Jerome Selitto ("Mr. Selitto"), made inflammatory and perceived racist statements while holding a "town hall meeting" with employees, a large number of whom were minorities, at PHH-Arval headquarters in Sparks, Maryland, near Baltimore.

The statements by Mr. Selitto sought to assure employees that his leadership style was not "like running a slave ship with whips" or similar statement. (JA 372-3).  He also indicated to management that the pathway to success would be "for that employee to be like the monkey that climbs the ladder and reaches the banana" even though he keeps getting "blown off by a fire hose" or similar words. (JA 311, 316, 486-7).

As an African-American minority and Chair of the PHH Diversity Committee ("Committee"), Vincent T. Mercer ("Mr. Mercer") was upset with the statements as were other employees. (JA 319, 486-7).

Mr. Mercer contacted Rita Ennis, Senior Vice President of Human Resources, and George Kilroy, PHH's President of the Board of Directors. (JA 319).  Mr. Mercer told Ms. Ennis that he was requesting Mr. Selitto meet with the Diversity Committee about his comments.  Ms. Ennis contacted Mr. Selitto and informed him about the offensive statements and that he should meet with the members of the Diversity Committee.  (JA 319).

8

At the meeting on April 22, 2010, Mr. Selitto proceeded to defend himself, became very dismissive and defensive of his reasoning that he had been watching a movie the night before, and finally apologized to the Committee for his statements, saying that he would be in his office the rest of the day if anyone needed to talk to him. (JA 319-20, 346-7, 486 at ¶ 15-22, 499-00). Mr. Mercer asked to speak with Mr. Selitto in his office and they met, with Mr. Mercer gently and respectfully confronting Mr. Selitto, explaining first that he honors his authority as "boss", and yet that his "apology" to the Diversity Committee appeared dismissive and that he should apologize to all those to whom he was speaking when he said the words. (JA 499-503). After some discussion, Mr. Selitto agreed to Mr. Mercer's request that he address his statements to employees with a Baltimore PHH campus-wide apology but he asked Mr. Mercer to draft it for him. (JA 319-20, 503).

After the meeting, Mr. Selitto testified that he "may" have expressed his "surprise" to members of his staff of being accused of racism. (JA 343-5). George Kilroy also met with Mr. Mercer about this matter and asked to be "kept abreast" of it. (JA 498-99).

VP of HR Rita Ennis and Mr. Selitto received the e-mailed apology language from Mr. Mercer soon thereafter, but Mr. Mercer still had to "press" Rita Ennis for a written apology to be

9

issued.  (JA 427).  Mr. Mercer recalled he was told by Ms. Ennis, "Vince, if it's a fight you want, a fight you will get." (JA 427, 504-5).  Mr. Mercer thought that might mean he should "back off" and took it as a warning, yet he persisted in seeking an apology from Mr. Selitto because he believed it his duty as Chair of the Diversity Committee.(JA 427-8, 504).

On May 13, 2010 Mr. Selitto finally issued the PHH Baltimore-wide e-mail apology for his statements (JA 294), but made no personal changes to the written apology suggested to him by Mr. Mercer which had input from another Diversity Committee member and was then e-mailed to Rita Ennis.  (JA 288, 319-22, 503).

A little over a month later, near the end of June 2010, subordinates of Ms. Ennis, in coordination with her, opened an investigation of Mr. Mercer and his co-manager, Mr. Nehmsmann, for dubious reasons.  (JA 588-9, 607).  Daniel "Danny" Hahn was "asked by Kim Bolin" to "monitor" the Mercer BTR call team. (JA 588-9).  Debbie Williams, who worked for Kim Bolin (JA 607) next "reported" to newcomer Chuck Hogarth that "Danny [Hahn] shared with her concerns" about "observations" regarding the use of Skill 427 by Mr. Mercer's team.  (JA 588-9).

Mr. Selitto testified that he was angry at his deposition because of the insinuation that his comments were in any way "racist" but that he was not angry with Mr. Mercer at the time

10

he complained because "no one was accusing me of racism then." (JA 317-18). However, Mr. Selitto testified in the same deposition that he was "really taken aback" at the time he met with the Diversity Committee and Mr. Mercer because "I couldn't believe that anyone thought I was making a racist comment...". (JA 276). Mr. Selitto testified he likely communicated this "[dis]belief" – which he also called his "surprise" – as a new CEO to senior level staff upon his return from meeting with Mr. Mercer and the Diversity Committee. (JA 320, 369).

Mr. Selitto testified that he surmised it "would have been" Rita Ennis who decided to terminate Mr. Mercer (JA 339-40) "because she was in charge of H.R. In Sparks, MD". *Id.* Rita Ennis reported directly to Adele Barbato, who reported directly to Mr. Selitto, however, Ms. Ennis actually had direct contact with Mr. Selitto himself regarding the Diversity Committee and Mr. Mercer's complaints, via e-mail correspondence. (JA 346 at ¶ 8-15).

Under Rita Ennis' and George Kilroy's authority, Kim Bolin issued a letter of termination to Mr. Mercer on August 26, 2010 stating that the reason he was being fired was for his "involvement in misrepresenting the...Average Speed of Answer statistics for June and July 2010" – for June 2010 she claimed the statistics reported were off by 38 seconds and for July she claimed they were off by 50 seconds. (JA 572).

Yet, the call-data documents presented as "proof" of Kim Bolin's statistics "misrepresentation" begin as dated "May 1, 2010" - during the very same period of time that Mr. Mercer was making his complaint to Rita Ennis.  (JA 585).

Yet, Kim Bolin had authorized "Skill 427" but she told PHH "not in this manner" (of an extra 38-50 seconds per call average on-hold), and PHH then stopped using Skill 427 in order to "revise" the "triage" process of how agents were to place calls on hold.  (JA 588). PHH claimed a few calls were on hold for a "maximum wait time of 54:05 minutes" but does not state whether those calls were all handled by agents under Mr. Mercer or another manager, and also states that Mr. Mercer's team was only off the best target answer time of two minutes by 46 seconds for June 2010. (JA 588).  Mr. Mercer did not "misrepresent" any statistics to PHH or its client as the PHH agent's calls are all recorded and PHH collects that data itself, and then sends it to the client, and Mr. Mercer maintained written communication with Ms. Bolin as to the use of Skill 427 for heavy call volume periods. (JA 424-27, 583, 572).

Yet, other agents, such as Julie Ahrens and Dan Sage who worked with Kyle Rhodes under Michele Roberts and not under Mr. Mercer's control, were instructed by Tim Mackin to utilize Skill 427 "call-hold" procedures, whose managers were not disciplined nor fired like Mr. Mercer. (JA 299, 608-09).

12

Mr. Mackin's testimony confirmed he spoke with Kyle Rhodes, Dan Sage and Julie Ahrens, but not necessarily to authorize "Skill 427" call-hold usage as Ms. Rhodes swore he did (See JA 299 at ¶ 15-18), but only "about [them] getting trained on Budget". (JA 248-9).  However, first he testified that he never met with those three agents, only to appear to change his statement nearly mid-sentence. (JA 248-9).

Mr. Selitto testified that he "did not get involved in any termination of any employee" [sic] (JA 334), but then testified that he personally terminated an employee because of bad "chemistry" and would be "apprised" by any potential high profile terminations. (JA 351-2, 359).

Mr. Selitto testified on page 29 of his deposition that he "did not know" the names Kim Bolin and Pam Walinski, the two individuals who signed Mr. Mercer's termination letter, but on pages 73 & 76 of the same deposition testified that he did know them, equivocating on his knowledge of Kim Bolin, but identifying Pam Walinski and "Kim" as those who were part of the Baltimore senior leadership team of George Kilroy, with whom he interacted.  (JA 308, 329-30, 333-4).

As part of senior leadership management team with George Kilroy, Kim Bolin and Rita Ennis would have been part of meetings with George Kilroy and Mr. Selitto during the period of time when Mr. Mercer brought the complaints and insisted on the

13

company-wide apology e-mail by Mr. Selitto.  (JA 308, 329-30, 333-4).

Under the authority of Rita Ennis, Kim Bolin lead an investigation into, and then signed the termination letter of Mr. Mercer, but it was Rita Ennis who actually fired him according to Mr. Selitto, though Ms. Ennis stated she only "participated." (JA 43 at ¶ 16, 339-40, 573, 588).

Ms. Bolin was never investigated, even though she was one of the managers, with Tim Mackin, which both Mr. Mercer and Mr. Nehmsmann stated authorized the "Skill 427" extension "16310" placing of individuals on hold during high volume times.  (JA 474, 573, 589 (last sentence), 602, 611-12).

The investigation of Mr. Mercer showed that he provided no written direction to misuse or even use any Skill 427 or extension 16310 or any other "misrepresentation" but that Mr. Nehmsmann was the manager who wrote the e-mails to agents (JA 194).  Michele Roberts confirmed Mr. Mercer's account of Mr. Mackin and Ms. Bolin discussing at a manager's meeting in early June 2010 a similar approach of Skill 427 extension 16310 transfers of calls being used by Ford Roadside Assistance, a competitor, to "lower the ASA" and according to the investigation notes she stated she vehemently disagreed with using that approach.  (JA 594 at ¶ 4 under "Aug. 12").

In order to utilize the pass-word protected "Skill 427 extension 16310" phone line extension, a manager such as Tim Mackin had to sign for its use. (JA 424, 418, 605).

Ms. Bolin interviewed Tim Mackin, the manager over Louis Nehmsmann and Vince Mercer, but provided him special treatment during the interview that she did not provide Mr. Mercer, spoilating the evidence by telling him upfront "in confidence" that Mr. Nehmsmann and Mr. Mercer had said he had "approved Skill 427" prior to asking him questions. (JA 593, "Aug. 9" mtg., ¶ 2).

Ms. Bolin also:

1. received an e-mail from Vince Mercer about "Skill 427" use for the heavy volume of calls expected over Memorial Day weekend on May 26, 2010 (JA 426-7);

2. at the early June 2010 manager's meeting only 15 business days or less from when Mr. Mercer had insisted on the Selitto apology letter and after she, as a member of leadership at PHH-Arval had received that letter via e-mail, publicly challenged Mr. Mercer's loyalty to PHH openly in front of other managers, which challenge Mr. Mercer rebuked strongly at that time, certain she did not appreciate it (JA 425, 594);

3. only a few business days after challenging Mr. Mercer's loyalty to PHH on or about June 14, 2010 – exactly one (1) month after the protected activity – placed Tim Mackin in an "interim" manager position over Vince Mercer and Louis Nehmsmann (JA 538-40);

4. then a few days later in "late June 2010," coinciding in time with the issuance to the Mercer/Nehmsmann call center team the password protected "New Skill" (427) extension 16310" on June 27, 2010, assigned Daniel "Danny" Hahn to begin investigating Mr. Mercer's BTR calls - a little more than 30 days after the protected activity – (JA 424, 589 at ¶ "FRI 7/23", 605);

15

5. came back from vacation to help lead the "investigation" against Mr. Mercer complete with prepared talking points only for use against Mr. Mercer and no other employee (JA 591, 611-12); and,

6. ultimately, signed Mr. Mercer's termination letter under authority of Rita Ennis (JA 339-40, 596).

Although Mr. Selitto testified he never talked with anyone about Mr. Mercer's termination (JA 333), and had "absolutely no idea he was terminated" (JA 334 at ¶ 9), he also testified he did learn about Mr. Mercer's termination through a "by-the-way comment" from someone at PHH (JA 334 at ¶ 6-7). Rita Ennis stated she was the one who told him this, but not until Mr. Mercer filed his discrimination complaint in March 2011. (JA 43 at ¶ 15).

PHH terminated Mr. Mercer first, then later that day it terminated Mr. Nehmsmann (JA 483 at ¶ 11). Rita Ennis claims Mr. Mercer was terminated for reasons different from the PHH reason provided to the Maryland Unemployment Commission and different from his termination letter. (JA 427 at ¶ 32, 435, and 572).

Michele Roberts, a similarly situated call-center supervisor, was not disciplined or fired even though her team members Julie Ahrens and Dan Sage, according to Kyle Rhodes, participated in the Skill 427 transfers. (JA 299-300).

Ms. Kim Bolin was "promoted" at least twice at the time of and after terminating Mr. Mercer between the "investigation"

16

notes date of August 23, 2010 and September 2013,: first to

"Director" of the PHH Fleet Call Center ("PROMOTED" "TBD", see

JA 600), and then to the position of Vice President of the PHH

Vehicle Maintenance and Call Center operations, at the same

Baltimore location. (JA 433, 600).

## IV.   SUMMARY OF ARGUMENT

## Race Discrimination

Relief is available to Plaintiff under 42 U.S.C. § 2000e-2

(discriminatory termination)when a Plaintiff in proper person

describes a charge, facts reasonably related to a charge, or

those developed by investigation into a charge, which are

sufficient to put the Defendant on notice of his racial

discrimination claim. *Mallik v. Sebellius*, 964 F. Supp. 2d 531

(D. Md. 2013)(citing *Sydnor v. Fairfax County, VA*, 681 F.3d 591,

594 (4th Cir. 2012).  There, this Court found:

> an "administrative charge of discrimination
> does not strictly limit a Title VII suit
> which may follow." Instead, so long as "a
> plaintiff's claims in her judicial complaint
> are reasonably related to her EEOC charge
> and can be expected to follow from a
> reasonable administrative investigation,"
> she "may advance such claims in her
> subsequent civil suit." We have therefore
> found exhaustion where both the
> administrative complaint and formal
> litigation concerned "discriminat[ion] in
> promotions" but involved different aspects
> of the "promotional system,"... and where
> both the EEOC charge and the complaint
> included claims of retaliation by the same
> actor, but involved different retaliatory

> conduct. In doing so, we have sought to
> strike a balance between providing notice to
> employers and the EEOC on the one hand and
> ensuring plaintiffs are not tripped up over
> technicalities on the other.

*Id.*, (citing, *Sydnor*, 681 F.3d at 594 (4th Cir. 2012)(internal citations omitted)(bold emphasis added)).

The District Court explained this doctrine: "To penalize Plaintiff solely for his failure to check a box, as Defendants would have the court do, would inadvertently convert the administrative process into a "trip-wire" for the unwary *pro se* Defendant." *Banhi v. Papa John's USA, Inc*, 2013 U.S. Dist. LEXIS 100291 at *16-7 (D. Md. July 17, 2013). Here, this "anti-trip-wire" doctrine could not be more applicable. Plaintiff Mercer made out a "discrimination *and* retaliation" complaint to the Maryland Commission on Civil Rights for discrimination for race complaints he made at work, and for retaliation and firing for that protected activity. (JA 295). The lower court cites a missed "check-box" for race, however, it erred in holding that failure against Plaintiff since he was 1) *pro se* at the time, and, 2) not permitted to check the box himself. The MD Commission investigation agent performs such tasks by providing the form for the complaint, and providing "appropriate assistance" and does not generally permit an unrepresented actor to check boxes as the data provided orally to the investigator

is typed into the complaint on the investigator's computer. *See* Md. Code Regs. 14.03.01.03(D)(2)-(4).

Additionally, the court erred because there is no requirement that *any* box be "checked" – nor that there exist any box identifying any particular discrimination category – in order to file a charge of race discrimination in Maryland. Md. Code Regs. 14.03.01.03(D)(6),(7). All that is necessary under Maryland regulatory law for the form of the complaint are the names and addresses of the complainant and the respondent(s), a concise statement of the facts including dates alleging the discrimatory practice. *Id.* at (D)(7).

Furthermore, Mr. Mercer's complaint stated affirmatively he had complained of "racially motivated and discriminatory" statements and believed in response he was "discriminated against" and "subject to retaliation" upon the "protected activity." (JA 295). This was because of his making a racial complaint and for the retaliatory firing for making the complaints. (JA 295, 427 at ¶ 34-5). He also believed he was discriminated against because of the "shifting explanations" provided him for his termination. (JA 427 at ¶ 32, 434-36).

Accordingly, Mr. Mercer has exhausted his administrative remedies and has made out a *prima facie* race discrimination complaint of which the lower court has subject matter

19

jurisdiction.  This Court should remand his complaint for a trial by jury.

## **Retaliation**

Relief is also available to Plaintiff under 42 U.S.C. § 2000e-3 (retaliatory termination) for engaging in a protected activity. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. Va. 2005).  Mr. Mercer has shown a causal link between his racial complaint made to the same person, Rita Ennis, who fired him.

Mr. Mercer has further shown the firing was pretextual because he was investigated within days after making the complaint, was threatened by Rita Ennis who oversaw the investigation and ensured he was found complicit *with another manager's call decisions* which he was copied on in e-mails, and which were approved by the supervisors Mackin and Bolin.  Mr. Mercer was then fired in violation of company policy which provides that such stellar employees like himself would first be given remediation on policy mistakes.  There was no "non-disriminatory reason" for termination because there is evidence that at least four (4) witnesses testified that Tim Mackin approved of the call-hold measures during heavy call volumes and that it was industry practice. These material facts are gravamen in this case.

*Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998), does not support a finding that "Mercer has failed to cite any evidence upon which a reasonable jury could conclude that those who terminated him knew about his complaints about Selitto." (JA 565). The court cites the *Ennis* affidavit to say that *Selitto* didn't know about Mercer's firing. (JA 565-6). This is plain error because the court found in its facts that *Ennis* received the race complaint against Selitto from Mr. Mercer, and *Ennis* fired Mr. Mercer according to Mr. Selitto. (JA 566, footnote 16). Thus, the lower court itself found sufficient facts or a reasonable jury to be able to causally link "those who terminated [Mercer, with those who] knew about his complaints about Selitto." *Id.; Causey v. Balog*, 162 F.3d at 803.

Mr. Mercer was not terminated four months after requesting that Selitto apologize. It was decided he would be terminated on either August 23rd, or 24th, 2010 and he was on August 26th – only three months and two weeks from May 13, 2010. (*See* JA 572, 596 (last sentence), and 600 ("Investigation File – BTR Leadership changes")).

The alleged "non-discriminatory reason" for Mercer's termination is belied by material facts demonstrating not only that the investigation was pretextual, which it was, but that it was a completely false basis for termination of Mr. Mercer. Mr. Mercer could not have done anything to deserve the investigatory

persecution and firing because those who were investigating him
had actually *approved* of all actions by his team. Even if the
court were to take PHH's viewpoint on that fact, instead of Mr.
Mercer's facts of four witnesses testifying under oath that
Mackin and Bolin both approved of the use of Skill 427 in the
manner it was used, a reasonable jury could still find for Mr.
Mercer on this point because the weight of evidence is in his
favor.

The court's inquiry on summary judgment need only stop where
the genuine dispute stands. *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986). There is a substantial, genuine
material dispute over whether PHH, via Mackin and Bolin,
approved of the very same methods for which it fired Mr. Mercer
not long after his racial complaint against the new CEO Selitto
and Selitto's public apology.

Accordingly, it was plain error for the lower court to grant
Defendant's motion for summary judgment and this case must be
sent back for a trial by jury on the merits.

## V.    ARGUMENT

### 1.    The Standard of Review.

A dismissal by the trial court is reviewed *de novo* and its
Rule 12(b)(6) analysis weighs only the legal sufficiency of the
complaint. *Leatherman v. Tarrant County narcotics Intelligence
& Coordination Unit*, 507 U.S. 163, 164 (1993).  In 2007, the

Supreme Court in *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007), overruled the "no set of facts" standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957), yet directly cautioned it had not created a heightened pleading standard. *See Bell Atlantic*, 550 U.S. at 570.

Under *Bell Atlantic*, a complaint need only state enough facts to state a claim for relief that is plausible on its face. *Id.* at 570. "Specific facts are not necessary;" a complaint only needs to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 92 (2007)(per curiam)(interpreting *Bell Atlantic*). The Federal Rules of Civil Procedure demand only that a complaint present a "short and plan statement of the claim showing that the pleader is entitled" to the relief sought. Fed. R. Civ. P. 8(a)(2).

When ruling on a motion to dismiss, the complaint must be liberally construed in the light most favorable to the plaintiff. *See Bell Atlantic*, 550 U.S. at 555. A court must accept the facts alleged as true, regardless of whether it believes them. *Id.* Thus a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely." *Id.* at 556. To permit dismissal, plaintiff's entitlement to relief must be entirely implausible. *Id.* at 570. Given the low threshold for surviving a motion to dismiss, it

23

"is important to keep in mind that a dismissal under Rule 12(b)(6) is a harsh remedy which should be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading, but also to protect the interests of justice." *White v. Mortage Dynamics, Inc.*, 528 F. Supp. 2d 576, 578 (D. Md. 2007).

An award of summary judgment is also reviewed *de novo. Navy Fed. Credit Union*, 424 F.3d at 405. Viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party, *see Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004), such an award "is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Navy Fed. Credit Union* at 405 (internal quotes citing Fed. R. Civ. P. 56(c).[3]

A dispute about a material fact is genuine if a "reasonable jury could return a verdict for the nonmoving party" upon such

---

[3] The advisory committee's note shows it restored the word "shall" because it was expressing the nondiscretionary nature of the direction to grant summary judgment.  Fed. R. Civ. P. 56(a) advisory committee's note.  With this mandate, the court does "not...weigh" facts, instead it must "determine whether there is a genuine" dispute for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 and 255 (1986).

evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must "view the evidence in the light most favorable to" the nonmoving party "and draw all reasonable inferences in [his] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), including when the Court reviews its "affirmative obligation" to deny a trial to any frivolous claims. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003)(citation and internal quotation marks omitted).

### 2. Plaintiff Mercer Exhausted his Administrative Remedies for his Substantive Race Discrimination Claim Under the Anti-Tripwire Doctrine.

There is no mention of the "anti-tripwire" doctrine by the lower court in its opinion dismissing Mr. Mercer's racial discrimination claim for lack of subject matter jurisdiction, nor mention of the Maryland regulations governing the form of a discrimination complaint. (JA 563). Further, the court overlooked the actual words Mr. Mercer pleaded in his complaint to the Maryland Commission and as such, misapprehended any application of a legal standard. This is plain error that must be reversed, and the race discrimination claim remanded for trial.

A.   PHH CEO'S STATEMENTS "SLAVE SHIP AND WHIPS" AND "MONKEYS" COMPLAINED OF AS "RACIALLY MOTIVATED AND DISCRIMINATORY" AND BEING "DISCRIMINATED AGAINST AND SUBJECT TO RETALIATION" WERE REASONABLY RELATED CHARGES, PLACING DEFENDANT ON FULL NOTICE OF A RACE DISCRIMINATION CLAIM.

The law requires a Plaintiff exhaust his administrative remedies by putting the Defendant/Respondent on notice as to 1) those discrimination claims stated in the initial charge, 2) those reasonably related to the original complaint, and 3) those developed by reasonable investigation of the original complaint. *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 538 (D. Md. 2013)(emphasis added)(citing *Sydnor v. Fairfax County, VA*, 681 F.3d 591, 594 (4th Cir. 2012) and *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)).  The discrimination and retaliation charges must be filed either with the EEOC or with the State or local office handling such complaints, here the Maryland Commission on Civil Rights. The EEOC typically assists the employee with filing a charge. *Balas v. Huntington Ingalls Indus.*, 711 F.3d 401, 407 (4th Cir. Va. 2013).  The Maryland Commission also assists in the same manner.  Md. Code Regs. 14.03.01.03(D)(2)-(4)(2015).

The requirement for filing a charge before the Commission or EEOC is for two reasons: 1) to put the Respondent on notice of the asserted violations of discrimination law; and, 2) to bring the employer before the [investigating body] to effectuate the

Civil Rights Act's "primary goal", "the securing of voluntary compliance with the law." *Balas v. Huntington Ingalls Indus.*, 711 F.3d 401, 406-407 (4th Cir. Va. 2013)(citing *Dickey v. Greene*, 710 F.2d 1003, 1005 (4th Cir. 1983), rev'd on other grounds, 729 F.2d 957 (4th Cir. 1984) (quoting *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969)).

The lower court held that it lacked subject matter jurisdiction over Mr. Mercer's race discrimination claim pursuant to *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).  In that case, this Court held that "thus, a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." *Id.* (citing *Bryant v. Bell Atl. Md.*, Inc., 288 F.3d 124, 133 (4th Cir. Md. 2002)).  In *Bryant*, this Court held that the claimant's "Administrative investigation of retaliation, and color and sex discrimination, however, could not reasonably be expected to occur in light of Bryant's sole charge of race discrimination, and the investigation of the complaint did not touch on any matters other than race discrimination." *Id.*  And in *Jones*, this Court was citing to Federal EEOC regulations which were not the standard in the instant case, which was initiated under Maryland COMAR standards and practice.

27

Here, unlike *Bryant* and *Jones*, there was a year and a half-long investigation of both racial discrimination and retaliation, directly being answered on *both* points by Respondent/Defendant in writing before the EEOC. (JA 420). In *Jones* the plaintiff [or rather, the EEOC] did not check the race box on her *second* complaint before the EEOC because the charge included only a retaliation allegation for the filing of the first complaint, but "the first charge [of race, color and sex discrimination] did not give rise to any formal litigation" and so was not before the court. *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 304 (4th Cir. Md. 2009).

*Jones* is clearly distinguished from this case because here Mr. Mercer completely addressed both the assertion of race discrimination and retaliation in *one charging complaint*, both charges of which Defendant responded to in writing, and after the investigation was completed, and both charges were brought in litigation and properly before the lower court. *Id.* at 301, 304.

In his charging complaint before the Maryland Commission on Civil Rights Mr. Mercer amply stated: **"These comments...'slaves, whips and monkeys" were perceived...to be racially motivated and discriminatory...I believe I was discriminated against and subject to retaliation..."**. (JA 295). The lower court erred by finding only that "in his charge of discrimination, Mercer

28

recounted the facts surrounding the March 2010 town hall meeting, and alleged he was retaliated against because of his request for an apology." (JA 564 at ¶ 2). On its face, Mr. Mercer's charge did much more than "recount[]" the town hall meeting – he explained he made the complaint via a discussion directly with the CEO Selitto, claiming racial discrimination and made out charges of discrimination *and* retaliation such that both the EEOC and the Defendant recognized his charges as explained hereinabove. The "box" is computer-checked by the Commission. (JA 295). Mr. Mercer did not have access to that document on his computer, but the Commission input the data and checked the boxes. Maryland law does not even require boxes to make out a facially valid discrimination charge. *See* Md. Code Regs. 14.03.01.03(D)(6),(7).

Thus, the "anti-tripwire" doctrine of this Circuit is fully met because all allegations and assertions were properly made in his charge of discrimination, the Company was on notice and in fact responded to both the race discrimination and retaliation charges as part of the investigation, and the *pro se* claimant was not the one who checked the box; "Thus, Plaintiff's charge reasonably gave notice that he experienced discrimination...To penalize Plaintiff solely for his failure to check a box, as Defendants would have the Court do, would inappropriately convert the administrative process into a "tripwire" for an

unwary pro se complainant." *Banhi v. Papa John's USA, Inc.*,
2013 U.S. Dist. LEXIS 100291 at *16-7 (D. Md. July 17,
2013)(citing *Byington v. NBRS Fin. Bank* , 903 F. Supp. 2d 342,
349-350 (D. Md. 2012) (also citing *Sydnor v. Fairfax Cnty.*, 681
F.3d 591, 594 (4th Cir. 2012))

Additionally, all three elements under *Sydnor v. Fairfax
County, VA*, were met and both statutory reasons stated in *Balas
v. Huntington Ingalls* Indus., were accomplished, completely
exhausting all administrative remedies for both racial
discrimination and retaliation. *Sydnor* 681 F.3d at 594; *Balas*,
711 F.3d at 406-7(internal citations omitted). Mr. Mercer was
clear that he believed he was discriminated against by PHH
because he was an African-American chair of the Diversity
Committee who had made complaints against the new CEO Mr.
Selitto for alleged "racially motivated and discriminatory
statements." (JA 295). He made the internal complaints; he
opposed the discriminatory practice. *Id.* He went to the
Maryland Commission on Civil Rights which cross-filed his
complaint with the EEOC, and made a complaint out for
discrimination and retaliation. *Id.* The Company responded to
the charges by admitting in its rebuttal letter to the EEOC that
Plaintiff had made a "claim of race discrimination and possible
unlawful [sic] retaliation.". (JA 420). He waited over a year
and a half for the Commission and EEOC to finish the

administrative investigation.  There was nothing more he could have done.

He established the scope of the complaint for race discrimination for the investigation and termination; Mr. Mercer provided "direct evidence...relevant to and sufficiently probative of the issue" of race discrimination to the Commission.  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996).

The holding below further cites *Sewell v. Strayer Univ.*, 956 F. Supp. 2d 658, 668-69 (D. Md. 2013) for the premise that not checking a "box" will cause the discrimation charge to lack subject matter jurisdiction. (JA 564).  Yet, in that case the court found that the plaintiff's "Charge focuses exclusively on retaliation and does not expressly mention race-, color-, or gender-based discrimination."  *Id.* at 668 (bold emphasis added). That is discordant from the instant case, where Mr. Mercer did expressly state his race discrimination assertions and listed what those were in the charge: "racially motivated and discriminatory" statements by the CEO referencing "slaves, whips and monkeys" upon which the Company "discriminated against and subject[ed] [him] to retaliation". *Id.;* (JA 295).

Additionally, Mr. Mercer fully exhausted his administrative remedies as "his administrative charges" do not "reference different time frames, actors, and discriminatory conduct than

the central factual allegations in his formal suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. Md. 2005). The standard is not whether a box is checked or not on a form – as in Maryland one need not even have a box on his complaint. *See* Md. Code Regs. 14.03.01.03(D)(6),(7)); *Cohens v. Md. Dept. of Human Res.*, 933 F. Supp. 2d 735, 743 (D. Md. 2013)(complainant "neither checked the "retaliation" box...<u>nor</u> alleged retaliation in the charge's factual summary...")(emphasis added). Here, Mr. Mercer alleged a sufficient factual summary.

Even if this Court finds that only *indirect* evidence was presented by Mr. Mercer of race discrimination there is a *prima facie* discrimination case presented, and the presumption of illegal discrimination is established. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). The lower court did not reach this issue.

Mr. Mercer made out two (2) demonstratively serious charges which were investigated by the Commission and the EEOC, which he then later filed suit upon. He has exhausted his administrative remedies.

Respectfully, there was plain error by dismissing the race discrimination claim and as such the decision must be reversed.

**3.   Plaintiff's Retaliation Claim Should Also Proceed to a Jury for a Finding of Fact and Verdict Because Material Facts Are In Dispute Under Both the Pretextual and the Close Temporal Proximity Doctrines.**

The evidence provided to the lower court demonstrates that those who 1) investigated him and, 2) terminated him from employment with PHH, knew of his internal complaints.

Mr. Mercer has established a *prima facie* case of retaliation because he has demonstated 1) that for three (3) months he made internal complaints and follow-up requests about racially discriminatory statements by the new PHH CEO; 2) the same officer under Mr. Selitto at PHH-Arval – Rita Ennis – told Mr. Mercer "if it's a fight you want, then it's a fight you will get" and then Mr. Mercer began to be "investigated" within 30-45 days later; and, 3) was ultimately fired only two (2) months after the investigation began by Ms. Ennis, the primary person connected with knowledge of the protected activity that Mr. Mercer had brought forward. *Navy Fed. Credit Union*, 424 F.3d 406.

"Knowledge of [the protected activity] is essential to a retaliation claim," *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998), but there the court found that "Causey presented no evidence [the supervisor with knowledge of the protected activity] was involved in the investigation." *Id*. Yet, in the instant matter Rita Ennis was both the individual involved in

33

the protected activity *and* the person who took part in ordering his termination.  Mr. Selitto testified in his deposition that it would have been Rita Ennis who made the decision to terminate Mr. Mercer.  Rita Ennis, as head of HR at PHH-Arval, had copied Mr. Selitto directly on an e-mail regarding Mr. Mercer's internal complaints about the racial discriminatory statements. Ms. Ennis coordinated the written apology and – a major disputed fact in the record - told Mr. Mercer "if it's a fight you want, a fight you will get."  Over two weeks after allegedly e-mailing to Mr. Mercer suggested changes to the "apology" letter of Mr. Selitto, Ms. Ennis then e-mailed out the Mr. Selitto e-mail apology. (JA 525).  Ms. Ennis was in charge of HR at Sparks (Baltimore) Maryland, where Mr. Mercer worked and had brought his complaints.  Ms. Ennis was the direct supervisor of Ms. Ellen Quinn-Hamlin and Kim Bolin, who reported to her, and who investigated Mr. Mercer and, under authority of Ms. Ennis.  Mr. George Kilroy, Ms. Ennis, Kim Bolin and Ellen Quinn-Hamlin were a leadership team who regularly met with Mr. Selitto, and when pressed in his deposition Mr. Selito testified he "may" have told Mr. Kilroy of his "surprise" with being accused of racial discrimination because of his comments.   All this demonstrates there was sufficient knowledge of the protected activity to support a retaliation claim. *Causey* at 803.

34

Though *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) is referenced to support a suggestion of a lack of *prima facie* evidence in the instant matter of a decision-maker's knowledge of adverse employment action (JA 565 at ¶ 3), that case was overruled in large part in 2006 by the Supreme Court. *Hooper v. North Carolina*, 2006 U.S. Dist. LEXIS 72268, 43-44 (M.D.N.C. Oct. 3, 2006), *aff'd*, *Hooper v. North Carolina*, 222 Fed. Appx. 271, 2007 U.S. App. LEXIS 7105 (4th Cir. N.C., Mar. 27, 2007)(citing *Burlington Northern and Santa Fe Ry. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)). There, "the Supreme Court...explained that a Plaintiff need not show an "adverse employment action,"...in order to establish a prima facie retaliation case." *Id.* (internal citation ommitted). Now, a plaintiff need only show that a "reasonable employee would have found the challenged action materially adverse, which...might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. (quotations omitted)(emphasis added).

There is no longer any strict limitation fettering the employee such that he must show an employer's adverse action, thus it appears to follow that strict proof of "knowledge" of both the protected activity and an adverse employment action is not indicative in proving a *prima facie* case so long as there is

a *reasonable employee* belief of retaliation. *Burlington*, 548

U.S. at 68

The *Burlington* court explained:

> "The antiretaliation provision seeks to
> prevent employer interference with
> "unfettered access" to Title VII's remedial
> mechanisms. (citation omitted). It does so
> by prohibiting employer actions that are
> likely "to deter victims of discrimination
> from complaining to the EEOC," the courts,
> and their employers...**We refer to reactions
> of a reasonable employee because we believe
> that the provision's standard for judging
> harm must be objective.** An objective
> standard is judicially administrable. It
> avoids the uncertainties and unfair
> discrepancies that can plague a judicial
> effort to determine a plaintiff's [*69]
> unusual subjective feelings.

*Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68-69

(U.S. 2006)(bold emphasis added).

Here, it was widely known that Mr. Mercer, as head of the

Diversity Committee, had represented employees in complaining to

the CEO about his racially discriminatory statements, and at

least one was "concerned" for him in that capacity because she

didn't feel Mr. Selitto apologized directly for discriminatory

words he spoke.  (JA 299 at ¶ 14, 230 at ¶ 21).  Mr. Selitto's

e-mail apology, which Rita Ennis states she "edited", apologizes

for using "analogies" [sic] that "offended some employees and I

apologize for that".  (JA 294).

36

Furthermore, the test is not whether Mr. Selitto knew of Mr. Mercer's termination, but whether those who were involved with Mr. Selitto and Mr. Mercer regarding the racial complaint knew about Mr. Mercer's termination. *Causey* at 803. Here, Rita Ennis coordinated the protected activity, allegedly made threats to him, and participated in – and possibly directed - the firing of Mr. Mercer. Kim Bolin challenged Mr. Mercer's "loyalty to PHH" only days after she received the apology e-mail from Mr. Selitto which she knew had been coordinated by his office as Chair of the Diversity Committee, asked Danny Hahn to begin investigating Mr. Mercer's BTR call-center, and then she signed his termination letter.

Thus, even under a strict *Causey* rule of direct knowledge by the employer of a protected activity *and* of an adverse employment action, there is substantial material evidence in dispute on that point such that a prima facie case is met. 162 F.3d at 803.

Mr. George Kilroy, the Chairman of the Board who hired Mr. Selitto, and the CEO at PHH-Arval in Baltimore whose senior leadership team met at least quarterly with Mr. Selitto, had direct knowledge of the protected activity (JA 498-99); Ms. Ennis who investigated Mr. Mercer and ultimately oversaw his termination, had direct knowledge of Mr. Mercer's protected

activity – she coordinated it with Mr. Selitto himself, and threatened Mr. Mercer.

The entire leadership team at PHH-Arval in Baltimore, Rita Ennis, George Kilroy, Kim Bolin, Pam Walinski and Ellen Quinn-Hamlin, along with the new supervisor Tim Makin, had knowledge of the complaint and protected activity because they 1) knew their fellow manager Vince Mercer was the Diversity Committee Chair, and 2) each received the e-mail from the new CEO Mr. Selitto apologizing for the statements and regularly met with Mr. Selitto, creating multiple inferences for retaliation.

The employer and personnel who were involved in firing Mr. Mercer knew about his recent protected activity of complaining about the new CEO's racially discriminatory statements and the disputed material causal fact of Ms. Ennis threatening Mr. Mercer with "if it's a fight you want, a fight you will get" just prior to his insisting on an apology letter being issued and the investigation that ensued soon thereafter, substantiate a *prima facie* case of retaliation. *Causey* at 803.

> A.  THERE IS A GENUINE MATERIAL DISPUTE WHETHER DEFENDANT INVESTIGATED PLAINTIFF WITHIN FORTY-FIVE DAYS OF PLAINTIFF'S INTERNAL RACIAL COMPLAINT, AND THEN FIRED HIM.

Suprisingly the ruling below got the dates wrong on such an important factual issue pertaining to the legal merits of nexus of time between the protected activities and Plaintiff's firing.

38

(JA 566; "he was terminated four months after requesting that Selitto apologize").  The first issue is whether any *adverse action* was taken against Mr. Mercer after his protected activity, and as we've set forth in evidence it most certainly was – with an investigation beginning in June 2010.  (JA 573, 588).  However, Ms. Bolin also began a public berating of Mr. Mercer's "loyalty to PHH" within approximately **15 business days** from when Mr. Mercer had insisted Mr. Selitto send out the written apology. (JA 425, 594); *see also*, six-point timeline hereinabove, pgs. 13-14.  This disputed fact is material, since Mr. Selitto testified that individuals wanting to be "loyal" would not have taken any retaliation against Mr. Mercer.  (JA 366 at ¶ 4-9).

Then, on August 26, 2010, only a little more than two (2) months from when the formal investigation began in late June 2010, the adverse action of termination occurred against Mr. Mercer.

Sufficient probative evidence is cited in the record that a reasonable jury could find that pretextual retaliation was taken against Plaintiff because of Mr. Mercer's protected activity of bringing forward race discrimination complaints against the new CEO Mr. Selitto.  *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)(internal quotation marks omitted).

B.    THERE IS A GENUINE MATERIAL DISPUTE WHETHER DEFENDANT'S HR EXECUTIVE ENNIS, WHO WAS INVOLVED IN BOTH INCIDENTS, TOLD PLAINTIFF "IF IT'S A FIGHT YOU WANT, A FIGHT YOU WILL GET," INVESTIGATING PLAINTIFF ONLY WEEKS LATER AND THEN FIRING HIM.

The court below found that "nothing in the record establishes that Ennis had a discriminatory motive" for firing Mr. Mercer. (JA 566 at footnote 16). However, that finding includes the erroneous factual finding by the court that "Ennis was not a part of the initial investigation" of Mr. Mercer and that "the only person involved in both incidents was Ennis" and "Mercer does not remember the context of Ennis's statement "if it's a fight you want, it's a fight you will get." *Id*. This is erroneous for several reasons:  1) Mr. Mercer was clear that the comment occurred during a phone call when he was pressing for her to ensure Mr. Selitto issued a <u>written</u> apology for his statements (JA 427); 2) Ennis was <u>not</u> the only one "involved in both incidents" but as outlined above the evidence of communications about Mr. Mercer's Diversity Committee complaints is proven to have occurred between Mr. Selitto and Ms. Ennis, and possibly occurred between Mr. Selitto and Mr. George Kilroy – CEO of PHH-Arval and the man in charge over the entire leadership team involved in the investigation of Mr. Mercer. (JA 343-5, 498-99).

40

Although courts do not "sit as a kind of super-personnel department weighing the prudence of [employer's] decisions", *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998), this plaintiff is "entitled to a trial on the merits of a Title VII claim" because he has established a factual record permitting a reasonable fact-finder to conclude the likelihood that the investigation only 45 days from his protected activity which lead to his termination was the product of discrimination. *Darvishian v. Green*, 404 F. App'x 822, 828 (4th Cir. 2010).

The lower court erred by weighing these facts, and this Court should reverse that decision and remand the case for trial.

> C.   THERE IS A GENUINE MATERIAL DISPUTE WHETHER THE REASON FOR FIRING PLAINTIFF IS FALSE BECAUSE IT WAS KNOWN AND PERMITTED BY PHH CHAIN OF AUTHORITY.

There is a material dispute that the PHH chain of authority knew of the firing of Mr. Mercer, and indeed ordered the same, upon a false premise.  There is evidence in the record from four witnesses that Tim Makin and/or Kim Bolin approved of the placing the overload of calls on hold and into the "Skill 427 extension 16310" "que" in order to handle the load.

There is a material dispute of fact that Mr. Mercer was fired on a false, pretextual premise because he wasn't even the manager in charge of making the decision nor of issuing orders to employees to place phone calls on hold and into Skill 427.

Not only was the practice approved at the meetings with leadership, the PHH "investigation" revealed that Mr. Mercer never even e-mailed any orders to employees about this process but only Mr. Nehmsmann had done so.  Indeed, Mr. Mercer had e-mailed Kim Bolin on May 26, 2010 copying other members of PHH leadership inquiring as to how to handle call loads and the use of Skill 427 to handle Memorial Day weekend.

There is a material dispute whether the action taken against Mr. Mercer was pretextual and sufficient evidence is in the record whereby a reasonable jury may decide these disputed issues.

PHH has not "always been consistent about the reason for terminating [Mr.] Mercer" and has not provided any undisputed facts to support its pretextual firing.  (JA 426).  PHH's termination letter says one thing, and its Unemployment opposition says another.  (JA 434, 572). At "6:42 pm" on 9/7/2010 PHH provided its "employer comments" on the Maryland Unemployment Benefits hearing notes that the reason for separation was **"claimant was discharged for lacking the ability to properly perform the required job responsibilities."**  (JA 434).  That was both a bald misrepresentation and an inconsistent statement by the employer, overlooked by the court below.

42

It is plain error to state that it was a "reason honestly described," citing *Holder v. City of Raleigh*, 867 F.2d 823, 829 (4th Cir. 1989)(internal quotation omitted), (JA 568 at ¶ 1) but, it is evidence sufficient for a jury to decide pretext.

> D.    THERE IS A GENUINE MATERIAL DISPUTE WHETHER BUT-FOR PLAINTIFF'S COMPLAINT ABOUT SELITTO'S STATEMENTS AND REQUIREMENT FOR A COMPANY-WIDE APOLOGY, PLAINTIFF WOULD NOT HAVE BEEN TERMINATED.

PHH could not have fired Mr. Mercer but-for the retaliation because he was not even directly committing a mistake or improper procedure since four witnesses have confirmed that the process for which he was allegedly fired was authorized by Tim Mackin.

The court errantly ruled that "no reasonable jury could conclude that but-for [Mr.] Mercer's complaint about Selitto, he would not have been terminated" but then dismisses without a reason Mr. Mercer's evidence that the very actions for which he was allegedly fired were approved by his employer. (JA 569).  It would not be unreasonable for a jury to weigh that evidence, indeed, it would be necessary because a finding that the act was approved would demonstrate pretext.

Yet, the court cited *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) to find errant facts that the firing of Mr. Mercer was inevitable even without the complaint.

43

But those are strongly disputed facts.  Plaintiff's view of
those facts is demonstrated in the record as firing upon a false
premise, a pretext, for he had done nothing wrong and had only
brought forward a complaint. *Jiminez*, 57 F.3d at 378.  It is a
red herring for the Defendant to argue, and for the court to
accept as a finding against Mr. Mercer, the central point that
the adverse action against Mr. Mercer was for performing tasks
authorized by the Company.  This does not require the court to
"sit as a kind of super-personnel department weighing the
prudence of [PHH's] decisions", but rather, to allow a jury to
weigh the disputed facts of what those decisions and orders
actually were. *Id.*

Mr. Mercer was a stellar employee whom PHH was highlighting
on their international website as a model for the Company,
profiting from his photograph and positive statements, and not
until he made the racial complaints and followed through with
the demand for the apology for the same was he investigated and
terminated.  (JA 379-407).  According to a review of the
employee performance evaluations provided in discovery, Mr.
Mercer was an oustanding employee with high marks, certificates
of excellence, receiving promotions and bonuses and was so
respected he was appointed by PHH executives to serve as the
Chair of the Diversity Committee. *Id.*  No performance evaluation
was produced for 2010, however, his excellent record was

44

undiminished as he was one of only a couple employees world-wide who was at that time being highlighted on the PHH website as a model of success. *Id.*; (JA 430-1).

*Univ. of Tex. Southwestern Med. Ctr.* is cited by the court below in granting summary judgment to say that Mr. Mercer would have been fired from his job anyway because, "[i]t is thus textbook tort law that an action "is not regarded as a cause of an event if the particular event would have occurred without it." (internal citations omitted)." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (U.S. 2013)

Yet, here it is axiomatic that there are genuine disputed material facts on this very point – that PHH manufactured a false accusation about a matter it had authorized.  There are four sworn witnesses who have stated that PHH authorized the Skill 427 use of placing calls on hold during heavy volume periods, including Nehmsmann, Mercer, McDonald, Rhodes; and additional witnesses who stated the same thing during PHH interviews such as Chris Koutec.  (JA 595).  It is illogical for the court to take away this substantive material fact from the jury when it goes to the heart of the case.  133 S. Ct. at 2525 (U.S. 2013).

It is helpful here to review the tort law cited in *Nassar* at 2525.  There, the Restatement 2d Committee notes indicate the

increase of risk test which applies to the instant case in

showing but-for causation is met:

> Even where the result does not occur in the
> way or in one of the ways to which the
> defendant adverts, if his tortious conduct
> **increases the risk of harm by other means,**
> **and the desired result follows**, there is
> liability for the harm although the
> particular risk was insubstantial. Thus in
> the illustration just used, the fact that
> the tortfeasor did not advert to the risk of
> robbery would not prevent his liability for
> the harm caused by the robber.
>
> On the other hand...even where the harm
> would not have occurred but for the tortious
> act, there is no liability if, although the
> resulting harm was of the same general
> nature as that intended, the defendant's act
> did not increase the risk of harm through
> the means by which it occurred. Thus where a
> person pursues another, threatening and
> attempting to kill him, and the other is
> struck by lightning during the pursuit, the
> first is not responsible for the harm thus
> caused **unless the risk of being struck by**
> **lightning was increased by the pursuit.**

Restat 2d of Torts, § 435A(comment a).

Here, we have a similar scenario meeting the *Nasser* at 2525

but-for test under both a direct cause ("if it's a fight you

want, a fight you will get" - which was a promise delivered; and

Kim Bolin challenging Mr. Mercer's "loyalty" immediately after

the e-mailed apology letter went out), as well as this

"increased risk" causation. *Rest.* 2D of Torts at comment a.

PHH refused to provide requested call center staffing upon Mr.

Mercer's requests, a genuine, material disputed fact in the

record because Mr. Mackin admits to the lack in staffing and to discussing this with Mr. Mercer and Mr. Nehmsmann, but claims it was not a problem. (JA 538-542).  However, Mr. Mercer's testimony was that the lack of staff was a problem they had discussed, that he had specifically requested PHH remedy, and which was ignored by PHH, leading to the approval of Skill 427 by Tim Mackin, but then the immediate retaliation investigation by PHH. (JA 425 at ¶ 21-23, 426 at top of page ¶ 23).  Thus, the increase in workload with ignoring the staffing requests of Mr. Mercer – all during and after his Diversity Committee complaints to the CEO – resulted in an "increase of risk" that the intended result, the overload of calls and investigation into long hold times, was inevitable.  *Id.* at comment a.; *Nasser* at 2525. Thus, the but-for test is more than satisfied in this "make brick, no straw" result like the children of Israel in Egypt, proving that but-for PHH's design there never would have been an investigation and firing of Mr. Mercer.

Contrary to the order below, PHH has not provided a "nondiscriminatory reason" for Mr. Mercer's termination and any reference to the terminology of Defendant of alleged methodology is objected to because it is a material fact in dispute. Tellingly, PHH did not ask Wilrosea Moncur whether she knew if the Skill 427 use was authorized by Tim Mackin or Kim Bolin. (JA 594-5).  Also surprising, PHH failed to investigate

47

similarly situated persons whom Mr. Mercer identified as having knowledge of the authorized work procedures, such as John Gudknecht, Chris Forrest, Dan Sage, Julie Ahrens and others. Whether or not there was even an unauthorized call-hold "scheme" as the Defendant argues is vigorously disputed.  Plaintiff has made out significant and material facts tying the same leadership which was involved in his protected activity to the so-called investigation and his subsequent firing.  To take as a matter of fact the Defendant's viewpoint on these substantive factual issues is to commit error and to go into the realm of the jury's authority, while doing so using terminology that is at the center of the entire dispute.

What should be obvious in this case to a reasonable jury is that racially charged words such as occurred in this case do not get said in today's world, more less to a large audience of minority employees.  Then, when the man with a duty to respectfully make an internal complaint does so, and is soon thereafter investigated and fired for actions he was told to take, only a reasonable jury would then decide that such discriminatory investigation and firing was pretextual and retaliatory, and only because the race discrimination complaints were brought by Plaintiff.

This Court should vacate the ruling on both counts and remand the matter for a trial by jury.

## VI.   CONCLUSION

For the foregoing reasons, this Court should vacate the ruling of the District Court and remand this case for trial by jury on both the race discrimination and retaliation claims.

## VII. REQUEST FOR ORAL ARGUMENT

The undersigned respectfully requests the Court set in oral argument in this matter.

Respectfully submitted,


/s/ Daniel L. Cox
Daniel L. Cox, (Bar No. 28245)
MARR & COX, LLP
400 E. Pratt Street, 8th Floor
Baltimore, Maryland 21202
Telephone: 410-254-7000
Facsimile: 410-254-7220
E-mail:   dcox@marrcoxlaw.com
*Attorney for the Appellant*

# ADDENDUM

## TABLE OF CONTENTS

**Page**

Md. Code Regs. 14.03.01.03................................Add. 1

Restat. 2d of Torts, § 435A................................Add. 3



1 of 1 DOCUMENT

CODE OF MARYLAND REGULATIONS
Copyright (c) 2015 by the Division of State Documents, State of Maryland

* This document is current through the 3/6/2015 issue of the Maryland Register *

TITLE 14.   INDEPENDENT AGENCIES
SUBTITLE 03.   COMMISSION ON HUMAN RELATIONS
CHAPTER 01.   RULES OF PROCEDURE; PUBLIC HEARING PROCESS

*COMAR 14.03.01.04*   (2015)

.04 Complaint Processing.

A. Review and Authorization. After the filing of a complaint, the Executive Director or designee shall:

(1) Review the complaint to determine whether it should issue for reasons of standing of the parties, timeliness of the filing, or other matters upon which its issuance may depend;

(2) In cases where the complaint is acceptable, authorize an investigation by dating and signing the complaint; or

(3) In cases where the complaint is rejected and not susceptible to amendment, serve notice on the complainant stating the reasons for the rejection.

B. Notice.

(1) After the authorization of an individual complaint by the Executive Director or designee, as set forth in § A of this regulation, and not more than 120 days from the date on which this complaint was filed, the Commission staff shall provide notice of it by serving a copy of the complaint upon the respondent.

(2) The notice shall:

(a) Acknowledge the filing of the complaint and state the date that the complaint was accepted for filing;

(b) Include a copy of the complaint;

(c) Advise the respondent of the time limits applicable to complaint processing and of the procedural rights and obligations of the respondent under these regulations; and

(d) Advise the respondent that retaliation against an individual because the individual made a complaint, testified, assisted, or participated in an investigation or conciliation under these regulations is a discriminatory practice that is prohibited by Article 49B, Annotated Code of Maryland.

C. Answer to Complaint.

(1) The respondent may file an answer not later than 30 days after receipt of the notice described in B of this regulation.

(2) The respondent may assert any defense that might be available to a defendant in a court of law.

(3) The answer shall be signed and affirmed by the respondent.

(4) The affirmation shall state: I declare under the penalty of perjury that the foregoing is true and correct.

(5) An answer may be reasonably and fairly amended at any time with the consent of the Executive Director or designee.

COMAR 14.03.01.04

D. Withdrawal. A complaint filed by or on behalf of any aggrieved person may be withdrawn in writing at any time by the aggrieved person or person who filed the complaint.

E. Administrative Closure--Notice and Reopening.

(1) The Executive Director or designee may administratively close a complaint under those circumstances which, by way of example but not limitation, may include absence of information which establishes the whereabouts of the complainant, or the determination that statutory requisites have not been met.

(2) Notice of Administrative Closure.

(a) Written notice of the administrative closure shall be provided to the complainant's last known address, informing the complainant of the right to object to this closure within 15 days of the date on which this notice was mailed.

(b) If the complaint is withdrawn by the complainant, the 15-day notice provision to the complainant is not required.

(c) Written notice of the closure shall be sent to the respondent upon whom the complaint has been served.

(3) Objection to Administrative Closure.

(a) If the complainant files a timely objection, the Executive Director or designee shall consider the closure in light of the reasons stated by the complainant, and shall make a determination.

(b) In the absence of a timely objection, the Executive Director or designee shall close the complaint and mark the case file as administratively closed.

(4) Request to Reopen Complaint.

(a) A request to reopen a complaint administratively closed for lack of information establishing the whereabouts of the complainant that is received beyond the time for objecting specified in § D(2) of this regulation shall be considered only upon a showing of good cause made by the complainant.

(b) Factors to be considered in determining whether good cause exists include but are not limited to:

(i) The amount of time elapsed since the complainant last had contact with the Commission;

(ii) The circumstances surrounding the complainant's failure to inform the Commission of their whereabouts; and

(iii) Prejudice to the respondent.

F. Dismissal of Proceedings. As to cases which have not been filed with the Office of Administrative Hearings pursuant to Regulation .10B of this chapter, after notifying the complainant and respondent, the Executive Director or designee may dismiss without prejudice, at any stage of the proceedings, a case filed with the Commission, when the complainant has instituted an action in federal district court or State court alleging unlawful discrimination based on the same facts as those alleged in the complaint filed with the Commission.

**NOTES:**

**LexisNexis 50 State Surveys, Legislation & Regulations**

   Anti-Discrimination



Restatement of the Law, Second, Torts
Copyright (c) 1965, The American Law Institute

Case Citations

Rules and Principles

Division 2 - Negligence

Chapter 16 - The Causal Relation Necessary to Responsibility for Negligence

Topic 1 - Causal Relation Necessary to the Existence of Liability for Another's Harm

Title B - Rules Which Determine the Responsibility of a Negligent Actor for Harm Which His Conduct Is a Substantial Factor in Producing

Restat 2d of Torts, § 435A

§ 435A Intended Consequences

  **A person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, whether or not it is expectable, except where the harm results from an outside force the risk of which is not increased by the defendant's act.**

## COMMENTS & ILLUSTRATIONS: Comment:

  *a.*   The rule stated in this Section has its application in the field of damages to those cases where the defendant commits a tort against a person such as an assault, battery, trespass, or defamatory statement, acting for the purpose of causing a particular harm, and where such harm results.   The principle is the same as that which leads to the creation of a cause of action in favor of a person where the defendant acted for the purpose of harming him, in cases where, without such purpose, there would have been no liability, as where a person defrauds another for the purpose of causing pecuniary harm to a third person.   (See § 870.)

  The rule stated in this Section determines only the amount of damages to be recovered for a tort.   Its effect is to impose liability for a particular consequence even though had the defendant been merely negligent in the commission of the tort or liable for other reasons, he would not have been responsible for the particular result.   In such a case, the tortfeasor is liable for the consequence although it was unexpectable and although he did not believe that it was at all likely that such a result would happen.   Thus where a person defames another, actuated by the hope that such other will become insane because of the public disgrace, the defamer is liable for the insanity which results.   A similar result follows where a person who acts for the purpose of harming another adverts to a large number of different harmful consequences and is indifferent as to which consequence ensues.   Thus where a person intentionally knocks another down and leaves the other in the road, desiring that the other shall suffer serious harm but completely indifferent as to how it shall occur, he is responsible for the further wounding of his victim whether it occurs from the negligent driving of an automobilist or the stroke of a robber, since the risk of harm from a criminal attack, though slight, was increased by the helplessness of the injured person.

  Even where the result does not occur in the way or in one of the ways to which the defendant adverts, if his tortious conduct increases the risk of harm by other means, and the desired result follows, there is liability for the harm although the particular risk was insubstantial.   Thus in the illustration just used, the fact that the tortfeasor did not advert to the risk of robbery would not prevent his liability for the harm caused by the robber.

Restatement of the Law, Second, Torts, § 435

On the other hand, even where the tortfeasor intends a specific result which follows, there must be a causal connection between his act and the result.   Thus a person who, with murderous design, substitutes poison for the drinking water of a traveler, is not responsible for the death of the traveler in a train wreck before he has had a chance to taste the potion.   Likewise, even where the harm would not have occurred but for the tortious act, there is no liability if, although the resulting harm was of the same general nature as that intended, the defendant's act did not increase the risk of harm through the means by which it occurred.   Thus where a person pursues another, threatening and attempting to kill him, and the other is struck by lightning during the pursuit, the first is not responsible for the harm thus caused unless the risk of being struck by lightning was increased by the pursuit.

**REPORTERS NOTES:** This Section is moved forward to this point from § 915 of the first Restatement, where it is now omitted.

**CROSS REFERENCES:** ALR Annotations:

Application of "contemplation of parties" rule in tort actions.   48 A.L.R. 318.

Digest System Key Numbers:

Damages 20 et seq.
Negligence 56(1) et seq.
Torts 15

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed.
    R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [    ] this brief contains [*state the number of*] words,
    excluding the parts of the brief exempted by Fed. R. App.
    P. 32(a)(7)(B)(iii), *or*

    [ X ] this brief uses a monospaced typeface and contains
    [*1,222*] lines of text, excluding the parts of the brief
    exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.
    R. App. P. 32(a)(5) and the type style requirements of Fed.
    R. App. P. 32(a)(6) because:

    [    ] this brief has been prepared in a proportionally
    spaced typeface using [*state name and version of word
    processing program*] in [*state size and name of font*]; or

    [ X ] this brief has been prepared in a monospaced
    typeface using [*Microsoft Word 2007*] with [*10 inch per
    character Courier New Font*].

Dated: <u>April 3, 2015</u>          <u>/s/ Daniel L. Cox</u>
                                     *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 3rd day of April, 2015, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> J. Eric Paltell
> Joseph Garrett Wozniak
> KOLLMAN & SAUCIER, PA
> The Business Law Building
> 1823 York Road
> Timonium, Maryland  21093
> (410) 727-4300
>
> *Counsel for Appellee*

I further certify that on this 3rd day of April, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee listed above.

/s/ Daniel L. Cox
*Counsel for Appellant*